E-FILED
Wednesday, 17 March 2021 12:09:18 PM
Clerk, U.S. District Court, ILCD

FILED

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Central District of Illinois

FEB 3 - 2021

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The premises located at 121 Shady Lawn Dr., Rantoul,<br>IL further described in Attachment A1 | )<br>)<br>)  Case No. 21-MJ- 7022<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The entire property located at 121 Shady Lawn Drive, Rantoul, in Champaign County, Illinois, further described in Attachment A1, which is attached hereto and incorporated herein.

located in the _____Central_____ District of _____Illinois_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252(a) | Child Pornography Trafficking Offenses |
| 18 U.S.C. § 2252A | Child Pornography Trafficking Offenses |

The application is based on these facts:

See attached Affidavit of Dwayne Roelfs, TFO, HSI.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Dwayne Roelfs

_____
*Applicant's signature*

Dwayne Roelfs, TFO, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____by telephone_____ *(specify reliable electronic means).*

s/Eric I. Long

Date: ____02/03/2021____

_____
*Judge's signature*

City and state: ____Urbana, Illinois____

Eric I. Long, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Dwayne Roelfs, being first duly sworn, hereby depose and state as follows:

1.   I am a Deputy Sheriff, with the Champaign County Sheriff's Office, assigned to the Criminal Investigations Division. I have been employed at the Champaign County Sheriff's Office for over twenty–five years.  I am also a Task Force Officer (TFO) with the U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), assigned to the Resident Agent in Charge (RAC) in Springfield, Illinois since 2020. As part of my duties as an HSI/ICE TFO, I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violations of 18 U.S.C. §§ 2251, 2252(a), and 2252A. I have received training in the area of child pornography and child exploitation and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media.  I have also participated in the execution of numerous search warrants, many of which involved child exploitation and/or child pornography offenses.

2.   As a TFO, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S. C. § 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, child exploitation and child pornography offenses enumerated in 18 U.S.C. §§ 2251, 2252 and 2252A, et seq. As an HSI TFO, I am authorized to execute warrants issued under the authority of the United States.

3.   The statements contained in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning this investigation. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. I have set forth only the facts that I believe are necessary to establish probable cause, and that the fruits, evidence and instrumentalities of the offenses listed, will be in the following locations.

4.   This Affidavit is made in support of an application for a warrant to search the following:

> **a. The Subject Premises**: the residence located at 121 Shady Lawn Dr., Rantoul, Champaign County, Illinois, 61866 (hereinafter known as the "SUBJECT PREMISES"). The SUBJECT PREMISES to be searched is more particularly described as a single-story single-family residence with beige colored siding with brown colored asphalt shingles and the numerals "121" diagonally posted on the right side of the front entry door.  This single-family ranch style home has a detached two car garage matching the colors of the residence and is further described in Attachment A1. I am requesting authority to search the entire SUBJECT PREMISES, including the residential dwelling, detached garage, grounds, and any vehicles parked upon the property.

> **b. The Subject Vehicles:** a four-door blue colored 2006 Chevrolet Cobalt bearing Illinois license plate "309601", registered to ALAN L. DODD at the subject premises; and a four-door silver colored 2013 Buick Regal bearing Illinois license plate "AR37713", registered to JESSICA M. DODD at her previous known address, 1532 Hobson Dr., Apartment 9, Rantoul, Illinois, 61866 (hereinafter known as the "SUBJECT VEHICLES." The SUBJECT VEHICLES are further described in Attachment A2.

**c. The Subject Persons:** a pat-down search of ALAN L. DODD, a 37-year-old male born in September of 1983, and JESSICA M. DODD, a 31-year-old female, born in March of 1989 (hereinafter known as the "SUBJECT PERSONS"), to locate any digital devices where the items listed in Attachment B may be found and are further described in Attachment A3.

5. I am requesting authority to search the SUBJECT PREMISES, SUBJECT VEHICLES, and SUBJECT PERSONS for any computer, smartphone and computer media located therein where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of the violation of Title 18, United States Code, Sections 2252, and 2252A. As will be shown below, there is probable cause to believe that an individual at the SUBJECT PREMISES has possessed visual depictions of minors engaged in sexually explicit conduct (as defined in 18 U.S.C. § 2256) ("child pornography") in violation of Title 18, United States Code, Sections 2252 and 2252A.

6. I am familiar with the information contained in this Affidavit based upon the investigation I have personally conducted and based on my conversations with other law enforcement officers involved in this investigation.

7. Because this Affidavit is being submitted for the limited purpose of securing search warrants, I have not included each fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. §§ 2252 and 2252A are located at the SUBJECT PREMISES and within a computer and related peripherals, and computer media found at the SUBJECT PREMISES. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

3

8. The investigation has revealed that an individual assigned the Internet Protocol address ("IP address") 2604:2d80:a789:fc00:e465:6be4:e0c0:bbcb on October 26, 2020, accessed a Snapchat account: corabella9578, that reportedly possessed and distributed child pornography files to other users via Snapchat. This IP address belongs to Mediacom and resolves to an individual at 121 Shady Lawn Dr., Rantoul, Champaign County, Illinois, 61866, the SUBJECT PREMISES.

9. The investigation has further revealed that an individual assigned the Internet Protocol address ("IP address") 173.17.182.8 at various times on October 23, 2020, and October 25, 2020, accessed two Discord accounts: corabella11#9467 and corabella#2461, and a Twitter account: corabel50177712, that reportedly possessed and distributed child pornography files to other users via Discord and Twitter. This IP address belongs to Mediacom and resolves to an individual at 121 Shady Lawn Dr., Rantoul, Champaign County, Illinois, 61866, the SUBJECT PREMISES.

## STATUTORY AUTHORITY

10. As noted above, this investigation concerns alleged violations of the following:

    a. **Trafficking Child Pornography** in violation of Title 18, United States Code, Sections 2252A(a)(1) and (b)(1) prohibits any person from knowingly transporting or shipping, or attempting or conspiring to transport or ship, any visual depiction using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by computer or mail, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

    b. **Distribution and Receipt of Child Pornography** in violation of Title 18, United States Code, Sections 2252A(a)(2) and (b)(1) prohibits any person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any visual depiction using any means or facility of

interstate or foreign commerce, or that has been mailed or shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproducing any visual depiction for distribution using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce or through the mails, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

c.   **Possession of Child Pornography** in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) prohibits a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

11. The following definitions apply to this Affidavit and Attachment B:

a.   "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b.   "Chat room," as used herein, refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals may also have the ability to transmit electronic files to other individuals within the chat room.

c.   "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

d.   "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image of picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

e.   "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. See 18 U.S.C. § 1030(e)(1).

f.   "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

g.   "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

h.   "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" data security devices.  Data security hardware may include

6

encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

i. The term "email" (electronic mail) is defined as the text messages sent from one person to another via a computer, which may include images. Email can also be sent automatically to many addresses via a mailing list.

j. The term "Internet" is defined as the worldwide network of computers, a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide. The Internet is not an online service and has no real central hub. It is a collection of tens of thousands of computer networks, online services, and single user components. In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

k. "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet. An IP address sometimes contains a series of four numbers, IPv4, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Other IP addresses, referred to as "IPv6 address", appear as a longer series of numbers combined with letters, with blocks or chunks of characters separated by colons. Internet Protocol version 6 (IPv6) is the most recent version of the Internet Protocol (IP), the communications protocol that provides an identification and location system for computers on networks and routes traffic across the Internet. IPv6 was developed by the Internet Engineering Task Force (IETF) to deal with the long-anticipated problem of IPv4 address exhaustion. IPv6 is intended to replace IPv4. In December 1998, IPv6 became a Draft Standard for the IETF, who subsequently ratified it as an Internet Standard on 14 July 2017.

l. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers (ISPs) control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet.

IP addresses might also be "static," if an ISP assigns a user's computer an IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on dates and times.

m.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

n.      The term "web site" consists of text pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from the web servers to various web clients via Hyper-Text Transport Protocol.

o.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

p.      "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

q.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

r.      "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

s.      "Cloud" or "Cloud storage," as used herein, is a mechanism in which files can be saved to an off-site storage system maintained by a third-party – i.e., files are saved to a remote database instead of the (user's) computer's hard drive. The Internet provides the connection between the user's computer and the database for saving and retrieving the files.

t.      A provider of "Electronic Communication Service" ("ESP"), as defined in 18 U.S.C. § 2510(15), is any service that provides to users thereof the ability to send or receive wire or electronic communications. For example,

"telephone companies and electronic mail companies" generally act as providers of electronic communication services. See S. Rep. No. 99-541 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3568.

u.   "Short Message Service" ("SMS"), as used herein, is a service used to send text messages to mobile phones. SMS is also often referred to as texting, sending text messages, or text messaging. The service allows for short text messages to be sent from one cell phone to another cell phone or from the Web to another cell phone.

v.   "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

w.   A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

x.   "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## SERVICES PROVIDED BY SNAPCHAT

12. Based on my training and experience, I have learned the following about Snapchat's Services:

a.   Snap, Inc. is an American multinational technology and social media company that was founded in September of 2011, and based in Santa Monica, California. Snap, Inc. products include Snapchat and Spectacles, among others. Snapchat is a mobile application made by Snap Inc. and available through the iPhone App Store and Google Play. The application provides a way to share moments with photos, videos, and text. Snapchat's differentiating feature from other communications applications is that a sender can set a variable amount of time the message is viewable by the receiver. This time can be between one and ten seconds. At the expiration of time, the message is deleted from Snapchat's servers. Similarly, the

message disappears from the user's devices. If the receiver of a Snapchat message does not access the application on their device the message remains undelivered. Snapchat stores undelivered messages for 30 days. After 30 days the messages are deleted from the company's servers.

b. Snap, Inc. identified the Snapchat username: corabella9578, with user phone number, "12173430744" as being the sender of the child pornography, in the form of three digital image files, as specified in the National Center for Missing and Exploited Children (NCMEC) Cyber Tipline report #81935092. The three files that Snapchat reported were identified as apparent child pornography by NCMEC based on their "hash" match to previously known child pornography and were "publicly" viewable images. The three image files were sent with the aforementioned Cyber Tipline report and viewed by your affiant. The images depict the same prepubescent female in various poses that show a lascivious exhibition of the child's genitals.

## SERVICES PROVIDED BY DISCORD

13. Based on my training and experience, I have learned the following about Discord's

Services:

a. Discord is an American VoIP, instant messaging and digital distribution platform designed for creating communities. Users communicate with voice calls, video calls, text messaging, media and files in private chats or as part of communities called "servers." Servers are a collection of persistent chat rooms and voice chat channels. Discord runs on Windows, macOS, Android, iOS, iPadOS, Linux, and in web browsers. As of July 21, 2019, there are over 250 million users of the software.

b. Discord is built to create and manage private and public communities. It gives users access to tools focused around communication services like voice and video calls, persistent chat rooms, and integrations with other gamer-focused services along with the general ability to send direct messages and create personal groups. Although at first, Discord services seem directed towards only gamers, in recent years, it has brought several new updates, making it more useful for the general population.

c. Channels may be either used for voice chat and streaming or for instant messaging and file sharing. The visibility and access to channels can be customized to limit access from certain users, for example, marking a channel

10

"NSFW" (Not Safe For Work) requires that first-time viewers confirm they are over 18 years old and willing to see such content.

d. Discord reported the Discord usernames: corabella11#9467 and corabella#2461, with corresponding user ID numbers, "76929664381091842O" and "753407001954091138," as being the senders of the child pornography, in the form of five digital image files, as specified in NCMEC Cyber Tipline reports #81943563 and #81853229. The five files that Discord reported were identified as apparent child pornography by NCMEC based on their "hash" matches to previously known child pornography and were publicly viewable images. The five image files were sent with the aforementioned Cyber Tipline reports and all images were viewed by your affiant. The five reported image files depict the same prepubescent female in various poses that show a lascivious exhibition of the child's genitals.

## SERVICES PROVIDED BY TWITTER

14. Based on my training and experience, I have learned the following about Twitter's Services:

a. Twitter is an American microblogging and social networking service on which users post and interact with messages known as "tweets." Registered users can post, like and retweet tweets, but unregistered users can only read them. Users access Twitter through its website interface or its mobile-device application software ("app"), though the service could also be accessed via SMS before April 2020. Twitter, Inc. is based in San Francisco, California, and has more than 25 offices around the world. Tweets were originally restricted to 140 characters, but was doubled to 280 for non-CJK (collective term for Chinese, Japanese, and Korean) languages in November 2017. Audio and video tweets remain limited to 140 seconds for most accounts.

b. Twitter messages are public, but users can also send private "direct messages." Information about who has chosen to follow an account and who a user has chosen to follow is also public, though accounts can be changed to "protected" which limits this information (and all tweets) to approved followers. Twitter collects personally identifiable information about its users and shares it with third parties as specified in its privacy policy.

c. Twitter reported that an individual using the Twitter username: corabel50177712, and user ID number, "1320283795912884229,"sent two digital images files and one digital ".zip" file containing apparent child

pornography, in Cyber Tipline report #82103064. The two image files that Twitter reported were viewed by Twitter personnel before being reported to NCMEC. NCMEC identified the two image files as apparent child pornography based on their "hash" match to previously known child pornography. (It is unknown if Twitter viewed the ".zip" file and NCMEC analysts did not view that file. The Cyber Tipline report indicated that the ".zip" file contained a "hash" match to previous known child pornography). The two image files were sent with the aforementioned Cyber Tipline report and both images were viewed by your affiant. The two reported image files depict the same prepubescent female in various poses that show a lascivious exhibition of the child's genitals.

## DETAILS OF INVESTIGATION

15. On November 23 and 24, 2020, I received a total of five related CyberTip referrals regarding the possession and distribution of child pornography. CyberTips are routinely distributed from the Illinois Attorney General's Office, Internet Crimes Against Children (ICAC) division. These Cyber Tipline reports originated from the National Center for Missing and Exploited Children (NCMEC). Instagram, Inc.,[1] Snapchat, Discord Inc., and Twitter, Inc. all self-reported to NCMEC that one of their users (listed under one of the following usernames) "Cora Bella", "corabella9578", "corabella11#9467",

---

[1] Cyber Tipline report #81960568 involved the Instagram username/ID: "Cora Bella", and user ID, "44192351063." Instagram reported that on October 25, 2020, this user sent two digital image files flagged as child pornography. The files have been "locked" not viewed by the affiant but identified by NCMEC as matching the "hash" value to previously identifiable child pornography. NCMEC classified the two images as depicting prepubescent females in poses that show a lascivious exhibition of their genitals. Instagram included a third image file of the publicly viewable profile picture for this user. This profile picture appeared to be a cropped face photo of the same child pornography photo listed in the Snapchat Cyber Tipline report, involving the suspect sending that photo to another Snapchat user. *See* Snapchat case specifics included herein, paragraphs 16-21.

"corabella#2461", and "corabel50177712" had violated terms of service and was possessing content believed to be images of child pornography.

## SNAPCHAT CYBER TIPLINE REPORT

16. Snapchat reported that the "corabella9578" account, with telephone number, 217-343-0744, shared five digital image files, depicting the same naked prepubescent aged minor. Snapchat reported that on October 25, 2020, at 10:40:07 (UTC), an individual used the suspect Snapchat account, and sent the five child pornography files (three different photos with one of the three photos sent three different times) to another unidentified Snapchat user. Snapchat captured the IP address used to transmit the files as 2604:2d80:a789:fc00:e465:6be4:e0c0:bbcb.

17. Snapchat stated in the Cyber Tipline report that the five suspected images of child pornography were "publicly available." I viewed the five suspected child pornography image files and based on my training and experience, believe the files all contained child pornography, as that term is defined by federal law. The files are described as follows:

    a.    49f1a91f-ae28-4692-868c-8d6d9e08f041_CHAT_MEDIA_1603646692584_6802e3e6-a768-4344-84b1-d525ce1c5cb3.jpg – A naked minor female with blond colored hair, approximately 6-9 years of age, lying in a bed positioned on her back with her left side facing the camera, her legs spread widely apart showing her vaginal area, and her undeveloped breasts exposed.

    b.    49f1a91f-ae28-4692-868c-8d6d9e08f041_CHAT_MEDIA_1603623307779_3a2ef852-462c-4975-b0d8-1d7b2c8e5505.jpeg – Same naked minor female as previously stated, however, in this photograph she is positioned on her hands and knees with her buttocks/vagina fully and prominently positioned facing the camera. The female minor's face is visible with her attention looking back at the camera.

c.    49f1a91f-ae28-4692-868c-8d6d9e08f041_CHAT_MEDIA_1603644033586_8a2e4253-3092-40eb-8ee2-351905db5e0d.jpeg – Same naked minor female as previously stated, except, in this photograph she is positioned in the bed lying on her stomach with both lower legs folded up showing the bottoms of her feet. The female's face and attention are looking at the camera and her naked buttocks and right undeveloped breast are both visible.

d.    49f1a91f-ae28-4692-868c-8d6d9e08f041_CHAT_MEDIA_1603644810528_47ae5de7-efa0-413d-ada3-2e353d1bedc8.jpeg – Same photo as listed in sub paragraph c.

e.    49f1a91f-ae28-4692-868c-8d6d9e08f041_CHAT_MEDIA_1603623224345_7cea6aec-4d0d-4822-a7a1-7e106892b9ba.jpeg – Same photo as listed in sub paragraph c.

## SUBPOENA RESULTS FOR SNAPCHAT CYBERTIP

18. I determined that the IP address, 2604:2d80:a789:fc00:e465:6be4:e0c0:bbcb, was assigned to the Internet Service Provider: Mediacom Communications Corp., One Mediacom Way, Mediacom Park, New York 10918.  On January 4, 2021, a State of Illinois Subpoena Duces Tecum was sent to Mediacom for the IP records maintained by Mediacom,  requesting subscriber information for the user of that IP address: 2604:2d80:a789:fc00:e465:6be4:e0c0:bbcb, on the date and time that the suspect account was used to upload the five child pornography image files, October 25, 2020, at 10:40:07 (UTC).

19. On January 11, 2021, Mediacom provided the results for the subpoena indicating that IP address 2604:2d80:a789:fc00:e465:6be4:e0c0:bbcb was assigned to subscriber JESSICA M. DODD, a SUBJECT PERSON, at 121 Shady Lawn Dr., Rantoul, Illinois, 61866-2659, the SUBJECT PREMISES, in the Central District of Illinois. Mediacom further

provided an associated phone number for this subscriber account, #8383912500488495, as 217-202-0962 and noted that the account had been connected at the SUBJECT PREMISES since 08/10/2018 and was currently "active."

20. I determined that telephone number, 217-343-0744, for the time period October 1, 2020, to present, was a phone number maintained by Sprint, 6360 Sprint Parkway, Overland Park, Kansas, 66251. On January 6, 2021, a State of Illinois Subpoena Duces Tecum was sent to Sprint (managed by T-Mobile Legal & Emergency Response), requesting the subscriber records and last 30 days of call detail billing for that telephone number.

21. On January 19, 2021, Sprint provided the results for the subpoena and indicated that the telephone number had been assigned to subscriber, Alan Dodd, a SUBJECT PERSON, with a listed billing address at the SUBJECT PREMISES. Sprint's records indicated that the phone number had been assigned to Alan Dodd on December 26, 2018, and that the account was active as of December 25, 2020. Sprint's records stated that the current cellular phone using this phone number, 217-343-0744, was a phone with the following identifiers: International Mobile Subscriber Identity (IMSI): 312530017316433 – status date: 06/11/2020; Mobile Station Identification Number (MSID): 000002176630230 – status date: 12/26/2018; and Electronic Serial Number (ESN/MSN): 352904110263206 – status date: 06/11/2020.

### DISCORD CYBER TIPLINE REPORTS

22. Discord, Inc. reported that the "corabella11#9467" account identified as Discord user ID#: 769296643810918420,  and "corabella#2461" account identified as Discord user ID#: 753407001954091138, shared five collective digital image files, depicting the same naked prepubescent aged minor. Discord, Inc. reported that an individual accessed the suspect Discord, Inc. accounts, and sent the five child pornography files (two different photos with four of the five photos being sent four different times) to other unidentified Discord, Inc. user(s).

23. Discord, Inc. reported the suspect, username "corabella11#9467," uploaded three of the child pornography image files on October 25, 2020 at 10:04:49 and 13:50:41 (UTC) from IP address, 173.17.182.8; and on October 25, 2020 at 19:19:28 (UTC) from IP address, 172.58.142.150.

24. Discord, Inc. reported the suspect, username "corabella#2461," uploaded two of the child pornography image files on October 23, 2020 at 11:39:46 (UTC) from IP address, 99.203.200.239, and on October 23, 2020 at 18:01:05 (UTC) from IP address, 173.17.182.8.

25. Discord, Inc. stated in their Cyber Tipline reports that a total of five suspected images of child pornography were "publicly available" and that members of their company had viewed the images. I viewed the five suspected child pornography image files (four of the five photos shared the same "hash match" values and appeared to be the same photo shared or uploaded on four different occasions), that Discord, Inc. reported, nd based on my training and experience, believe the files contained child pornography, as that term is defined by federal law. The files are described as follows:

16

a. image0.jpg (MD5 hash value: 637be2a72d674a507d3fcb4a020b0261) – A naked minor female with blond colored hair, approximately 6-9 years of age, lying in a bed positioned on her back with her left side facing the camera, her legs spread widely apart showing her vaginal area, and her undeveloped breasts exposed.

b. image0.jpeg (MD5 hash value: 7eed5ff63caa32fb64d879305d3b3322) – Same naked minor female as previously stated, however, in this photograph she is positioned on her hands and knees with her buttocks/vagina fully and prominently positioned facing the camera. The female minor's face is visible with her attention looking back at the camera. (This photo was shared on four separate occasions)

### TWITTER CYBER TIPLINE REPORT

26. Twitter, Inc. reported that the "corabel50177712" account, identified as Twitter user ID# 1320283795912884229, shared two digital image files, depicting the same naked prepubescent aged minor. Twitter reported that an individual accessed the suspect Twitter account and sent the two child pornography files to another unidentified Twitter user. The suspect, username "corabel50177712," sent the two photos of child pornography on October 25, 2020, at 10:26:53 (UTC). Twitter reported that the suspect Twitter account was created earlier the same day, October 25, 2020, at 08:39:32 (UTC), and during the registration Twitter captured the suspect IP address, 173.17.182.8, that was used to send the two file names listed below.

27. Twitter, Inc. stated in the Cyber Tipline report that their company had reviewed the two suspected images of child pornography. They added that the two photographs were not "publicly available". I viewed the two photos of child pornography, that Twitter, Inc. reported, and based on my training and experience, believe the files both contained child pornography, as that term is defined by federal law.

a. h24psHh4.jpg - A naked minor female with blond colored hair, approximately 6-9 years of age, lying in a bed positioned on her back with her left side facing the camera, her legs spread widely apart showing her vaginal area, and her undeveloped breasts exposed.

b. esvSDQY6.jpg - Same naked minor female as previously stated, however, in this photograph she is positioned on her hands and knees with her buttocks/vagina fully and prominently positioned facing the camera. The female minor's face is visible with her attention looking back at the camera.

## SUBPOENA RESULTS FOR DISCORD AND TWITTER CYBERTIPS

28. I determined that IP addresses, 173.17.182.8, was assigned to the Internet Service Provider: Mediacom Communications Corp., One Mediacom Way, Mediacom Park, New York 10918. On January 4, 2021, a State of Illinois Subpoena Duces was sent to Mediacom for the IP records maintained by Mediacom, requesting subscriber information for the user of that IP address: 173.17.182.8, on the date and time that the Discord suspect accounts, "corabella119467" and "corabella#2461," and the Twitter suspect account "corabel50177712," were used on October 23, 2020 and twice on October 25, 2020 to upload child pornography image files.

29. On January 11, 2021, Mediacom provided the results for the subpoena, and stated that the IP address, 173.17.182.8, was assigned to subscriber JESSICA M. DODD, a SUBJECT PERSON, at 121 Shady Lawn Dr., Rantoul, Illinois, 61866-2659, the SUBJECT PREMISES, in the Central District of Illinois. Mediacom further provided an associated phone number for this subscriber account, #8383912500488495, as 217-202-0962 and noted that the account had been connected at the SUBJECT PREMISES since 08/10/2018 and was currently "active."

30. I determined that IP address 99.203.200.239 was assigned to the Internet Service Provider: Sprint, 6360 Sprint Parkway, Overland Park, Kansas 66251. On January 4, 2021, a State of Illinois Subpoena Duces Tecum was sent to Sprint for the IP records maintained by Sprint, requesting subscriber information for the user of that IP address, 99.203.200.239, on the date and time that the suspect account "corabella#2461" was used on October 23, 2020, to upload one photo of child pornography.

31. On January 12, 2021, Sprint provided the results for the subpoena and stated that the IP address, 99.203.200.239, was a "Natted" IP address, and that "logging information is not retained for the IP requested as it is only kept for the length of the session. When the session terminates, the logging information is lost. The data is not stored."

32. I determined that IP address, 172.58.142.150, was assigned to the Internet Service Provider: T-Mobile, 4 Sylvan Way, Parsippany, New Jersey, 07054. On January 4, 2021, a State of Illinois Subpoena Duces Tecum was sent to T-Mobile for the IP records maintained by T-Mobile, requesting subscriber information for the user of that IP address, 172.58.142.150, on the date and time that the suspect account, "corabella11#9467" was used on October 25, 2020, to upload one photo of child pornography.

33. As of this affidavit, T-Mobile has not provided return information for the IP address 172.58.142.150 as requested by the subpoena.

34. On January 11, 2021, your affiant checked the Illinois Secretary of State records database and learned that ALAN L. DODD, a male born in September  1983, was issued Illinois Driver's License D300-0128-3249, and the address listed on his driver's license was

121 Shady Lawn Dr., Rantoul, Illinois, 61866, the SUBJECT PREMISES. Additionally, ALAN L. DODD has one motor vehicle registered with the Illinois Secretary of State, at the 121 Shady Lawn Dr., Rantoul, Illinois address. The motor vehicle was listed as a 2006 Chevrolet Cobalt license "309601," VIN# 1G1AL55F967796553, one of the SUBJECT VEHICLES.

35. On January 11, 2021, your affiant checked the Illinois Secretary of State records database and learned that JESSICA M. DODD, a female born in March 1989, was issued Illinois Driver's License D300-4338-9690, and the address listed on her driver's license was 121 Shady Lawn Dr., Rantoul, Illinois, 61866, the SUBJECT PREMISES. Additionally, JESSICA M. DODD has one motor vehicle registered with the Illinois Secretary of State. The motor vehicle was listed as a 2013 Buick Regal license "AR37713," VIN# 2G4GS5EV9D9186767, one of the SUBJECT VEHICLES.

36. I checked ALAN L. DODD's local police contacts, databases, social media, and criminal history. The local police contacts for Dodd showed a the most recent contact with the Champaign Police Department on March 2, 2020, with Dodd reporting a "Found firearm", and that contact listed Dodd's address as 121 Shady Lawn Dr., Rantoul, Illinois, the SUBJECT PREMISES, and his phone number as being 217-343-0744 (the same phone number that Snapchat had listed as a suspect identifier in Cybertipline report #81935092). An online social media check revealed a Facebook profile for ALAN L. DODD, https://www.facebook.com/alan.dodd.963, and from previous posts on his timeline I located photos of a toddler-aged male child that appears to reside with DODD. It should be noted that the name of this child is part of an email address, [minor's

20

name]adodd@gmsil.com, that was recorded as one of the account identifiers listed in one of the two Cybertipline reports made by Discord, Inc.  Additionally, Alan's "About section" of his Facebook profile listed that he currently resides in Rantoul, Illinois.

37. I checked JESSCIA M. DODD's local police contacts, databases, social media, and criminal history. Dodd's criminal history check revealed no past arrests and no convictions. The local police contacts for Dodd showed a the most recent contact with the Rantoul Police Department on June 3, 2020, with Dodd listed as a witness in an Unlawful Use of Weapons incident, and that contact listed Dodd's address as 121 Shady Lawn Dr., Rantoul, Illinois, the SUBJECT PREMISES. An online social media check revealed a Facebook profile for JESSICA M. DODD, https://www.facebook.com/jessica.babcock.180, and from the "photos" section of her profile I was able to locate photos of the same toddler male.

38. On January 11, 2021, I contacted the Village of Rantoul Police Department and requested a "utility check" to see what names the village had listed for the residence located at 121 Shady Lawn Dr., Rantoul. I was advised that the Shady Lawn Dr. address had utilities (power/water) billed to ALAN DODD and that the account had been opened since 07/27/2018. The phone number that was listed in the utility billing records for Alan was 217-343-0744 (the same phone number that Snapchat had listed as a suspect identifier in Cybertipline report #81935092).

39. On January 13, 2021, I traveled to 121 Shady Lawn Dr., Rantoul, Illinois 61866, to observe and photograph the exterior of the single-family residence. The residence at 121 Shady Lawn Dr. is a single-story single-family residence with beige colored siding with

brown colored asphalt shingles and the numerals "121" diagonally posted on the right side of the front entry door.  This single-family ranch style home has a detached two car garage matching the colors of the residence. Additionally, I observed the following two vehicles parked in the driveway: a silver colored 2013 Buick Regal four door car parked in the driveway with Illinois rear license plate, AR37713, that registered to JESSICA M. DODD, and a blue colored 2006 Chevrolet Cobalt four door car parked in the driveway, positioned ahead of the Buick, with the Chevrolet containing an Illinois rear license plate, 309601, that is registered to ALAN L. DODD  at 121 Shady Lawn Dr., Rantoul, Illinois, 61866, the SUBJECT PREMISES, further described in Attachment A1.

40. Based on my training and experience, I know that Instagram, Inc., Snapchat, Discord, Inc., and Twitter, Inc. are applications commonly installed on an individual's mobile device.  I also know that men and women, often carry their mobile devices in the pockets of their clothing or in purses. I also know, based on my training and experience that individuals may transport or store electronic devices in vehicles they operate.

### BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

41. I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

   a.   Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

   b.    Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via

22

wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.     A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer – can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e.     The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.     Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide e-mail services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone or external media in most cases.

23

g.    As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

42. As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, the SUBJECT VEHICLES, or SUBJECT PERSONS, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

43. I submit that if a computer or storage medium is found in the SUBJECT PREMISES, in the SUBJECT VEHICLES, and on the SUBJECT PERSONS, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because

24

when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

44. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems

can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

c.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.

d.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

e.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic

and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

f.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

g.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

h.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

i.    I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used, data that was sent or received, notes as to how the criminal

27

conduct was achieved, records of Internet discussions about the crime, and other records that indicate the nature of the offense.

45. Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for several reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all the technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

28

c.    The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.    Computer users can attempt to conceal data within computer equipment and storage devices through several methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

46. Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime.  This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly.  Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and,

29

potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network.  Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

47. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC ACCESS TO DEVICES

48. This warrant permits law enforcement to compel **ALAN L. DODD** and **JESSICA M. DODD** (but not any other individuals present at the premises at the time of execution of the warrant) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s).  The grounds for this request are as follows:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.  If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

31

49. In my training and experience, users of electronic devices often enable the biometric features because they are a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

50. As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

51. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event

32

law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

52. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of **ALAN L. DODD** and **JESSICA M. DODD** to the fingerprint scanner of the devices found at the premises; (2) hold the devices found at the premises in front of the face of **ALAN L. DODD** and **JESSICA M. DODD** and activate the facial recognition feature; and/or (3) hold the devices found at the premises in front of the face of **ALAN L. DODD** and **JESSICA M. DODD** and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that **ALAN L. DODD** and **JESSICA M. DODD** state or otherwise provide the password or any other means that may be used to unlock or access the devices.   Moreover, the proposed warrant does not authorize law enforcement to ask **ALAN L. DODD** and **JESSICA M. DODD** to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## REQUEST TO SEAL

53. It is further requested that this Affidavit be sealed by the Court until such time as the Court directs otherwise. Given the confidential nature of this investigation, disclosure would severely jeopardize the investigation in that it might alert the target of the investigation at the SUBJECT PREMISES to the existence of an investigation and likely lead to the destruction and concealment of evidence, and/or flight.

## CONCLUSION

54. Based on the aforementioned information, I respectfully submit that there is probable cause to believe that an individual at the SUBJECT PREMISES described above is involved in possessing and distributing child pornography. I respectfully submit that there is probable cause to believe that an individual in the residence described above, the SUBJECT PREMISES, therefore has violated Title 18, United States Code, Sections 2251(a), 2252 and 2252A. Additionally, there is probable cause to believe that evidence of the commission of criminal offenses, namely, violations of Title 18, United States Code, Sections 2251(a), 2252 and 2252A, is located in the SUBJECT PREMISES or on the SUBJECT PERSONS or in the SUBJECT VEHICLES, and this evidence, listed in Attachment B to this affidavit, which is incorporated herein by reference, is contraband, the fruits of crime, or things otherwise criminally possessed, or property that is or has been used as the means of committing the foregoing offenses.

55. I therefore respectfully request that the attached warrants be issued authorizing the search of the SUBJECT PREMISES, the SUBJECT PERSONS, and the SUBJECT VEHICLES further described in Attachments A1, A2, and A3 and seizure of the items listed in Attachment B.

s/Dwayne Roelfs

Detective Dwayne Roelfs - HSI/ICE/TFO
Champaign County Sheriff's Office

Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on February 3, 2021.

s/Eric I. Long

Eric I. Long, Magistrate Judge
United States District Court

35

**ATTACHMENT A1**
**DESCRIPTION OF LOCATION TO BE SEARCHED**
**(SUBJECT PREMISES)**

The entire SUBJECT PREMISES, including the residential dwelling, detached garage, grounds, and any vehicles parked upon the property located at 121 Shady Lawn Dr., Rantoul, Illinois 61866. The SUBJECT PREMISES to be searched is more particularly described as: a single-story single-family residence with beige colored siding with brown colored asphalt shingles and the numerals "121" diagonally posted on the right side of the front entry door. This single-family ranch style home has a detached two car garage matching the colors of the residence.



**121 Shady Lawn Dr., Rantoul, Illinois 61866**

A1

## ATTACHMENT A2
## DESCRIPTION OF LOCATION TO BE SEARCHED
## (SUBJECT VEHICLES)

- A blue colored, four-door, 2006 Chevrolet Cobalt, VIN# 1G1AL55F9677965532018, bearing Illinois license plate "309601", registered to ALAN L. DODD at the subject premises, wherever this vehicle is found within the Central District of Illinois.

- A silver colored, four-door, 2013 Buick Regal, VIN# 2G4GS5EV9D9186767, bearing Illinois license plate "AR37713", registered to JESSICA M. DODD at the subject premises, wherever this vehicle is found within the Central District of Illinois.



## ATTACHMENT A2 - (CONTINUED)



**ATTACHMENT A3**
**DESCRIPTION OF LOCATION TO BE SEARCHED**
**(SUBJECT PERSONS)**

A pat-down search of ALAN L. DODD, a 37-year-old male born in September of 1983, and JESSICA M. DODD, a 31-year-old female born in March of 1989.

**ALAN L. DODD**



**JESSICA M. DODD**



A3

## ATTACHMENT B

### *Particular Items to Be Seized*

1.      Computer(s), computer hardware, computer software, removable digital media, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to:  visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.      Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

3.      Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in Title 18, United States Code, Section 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2).

4.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in Title 18, United States Code, Section 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), or child erotica.

5.      Any and all address books, names, and lists of names and addresses of individuals who may have been in communication by use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in Title 18, United States Code, Section 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2).

6.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any

means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in Tile 18, United States Code, Section 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2).

7.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in Title 18, United States Code, Section 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2).

8.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

11.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.     Any and all visual depictions of minors.

13.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in Title 18, United States Code, Section 2256(8) or any visual depiction of minors engaged in sexually explicit conduct,  as defined in Title 18, United States Code, Section 2256(2).

14.     Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.     Any and all notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2).

16.     Any and all locked safes or other locked containers that may contain evidence of the commission of criminal offenses, namely, violations of Title 18, United States Code, Sections 2252 and 2252A.

17.     Any and all evidence pertaining to the dates and times of access of the computer or cell phone, the use or knowledge of Instagram, Snapchat, Discord, and Twitter Accounts, and internet searches pertaining to the possession or dissemination of child pornography.

18.     Any and all evidence, data or information pertaining to internet history regarding the possession or dissemination of child pornography.

19.     Any and all evidence, data or information pertaining to any e-mail addresses that **ALAN L. DODD and JESSICA M. DODD** use.

20.     Records and information relating to the sexual exploitation of children, including correspondence and communications between shared users of "Instagram", "Snapchat", "Discord", and "Twitter".

21.     Records and information showing access to and/or use of "Instagram", "Snapchat", "Discord", and "Twitter".

22.     Records and information relating or pertaining to the identity of the person or persons using or associated with the following User ID numbers for the following Electronic Service Providers: "Instagram", "Snapchat", "Discord", and "Twitter": **44192351063 (Instagram), 12173430744 (Snapchat), 769296643810918420 (Discord), 753407001954091138 (Discord), or 1320283795912884229 (Twitter).**

As used above, the terms "records" and "information" refer to all forms of creation or storage, any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as prints, videotapes, motion pictures, or photocopies).

The term "computer" refers to all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions: desktop computers, notebook computers, mobile phones, tablets, server computers, smart phones, and network hardware.

The term "storage medium" refers to any physical object upon which computer data can be recorded. Examples are hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the search, photographs of the SUBJECT PREMISES may also be taken to record the condition thereof and/or the location of items therein.

During the execution of the search of the SUBJECT PREMISES described in Attachment A, law enforcement personnel are also specifically authorized to compel **ALAN L. DODD** (M/W,  D.O.B. 09/01/83) and **JESSICA M. DODD**

(F/W, D.O.B. 03/28/89) to display any biometric features, including pressing their fingers (including thumbs) against and/or putting their face before the sensor, or any other security feature requiring biometric recognition, of:

    (a)    any of the devices found at the SUBJECT PREMISES, on their PERSON, or in the SUBJECT VEHICLES, and

    (b)    where the devices are limited to those which can contain and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments, for the purpose of attempting to unlock the device's security features in order to search the contents as authorized by this warrant.

This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that **ALAN L. DODD** and **JESSICA M. DODD** state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the device.